Affirmed and Majority and Concurring Memorandum Opinions filed August
25, 2011.

 

In The

 

Fourteenth Court of
Appeals

___________________

 

NO. 14-10-00672-CR

___________________

 

Jack Murenga Harris, Appellant

 

V.

 

THE State of Texas, Appellee



 



 

On
Appeal from the 252nd District Court

Jefferson County,
Texas



Trial Court Cause No. 08-04271

 



 

 

MAJORITY MEMORANDUM OPINION

Appellant, Jack Murenga Harris, was tried for two
counts of aggravated assault.  He was convicted of one count and acquitted on
the second.  The parties agreed to a punishment of imprisonment for fifteen
years.  Appellant brings forth three points of error on appeal of his conviction. 
We affirm.

FACTUAL AND
PROCEDURAL BACKGROUND

In 2007, appellant’s
wife Deborah Harris (“Deborah”), Tandalon Scypion (“Scypion”), and Scypion’s
cousin Paige Cormier (“Cormier”) engaged in a physical fight outside a
nightclub named French Connection (“2007 Altercation”).  The parties knew each
other because Deborah taught Scypion and Cormier when they were students at
Thomas Jefferson High School.  Although Deborah and Cormier separately filed
police reports about the incident, no charges were ever brought.  Appellant was
not present during the 2007 Altercation.

On July 6, 2008,
appellant and Deborah went to French Connection.  Scypion was also present at
the club.  The parties agree on the above facts, but disagree about almost all
other events.

State’s Account 

Scypion testified she
was present at French Connection but did not see appellant or Deborah until she
left the building shortly before midnight.  She stated she did not have any
interactions with the Harrises inside the French Connection.  As she left the
nightclub, she met her distant cousin, Leroy Holmes, III (“Holmes”), outside
the building.  Scypion and Holmes conducted a conversation in front of
Scypion’s car, which was parked in front of the nightclub.  

Scypion alleged that as
the conversation continued, Deborah approached and faced her, but neither woman
spoke.  Holmes testified that he asked Deborah, “Hey, ma’am, how are you
doing?  Is there something you need?”

According to both
Scypion and Holmes, Deborah never responded because appellant entered the
conversation.  Although Scypion and Holmes differ about whether appellant made
any other remarks, they agree that appellant warned Holmes that he should not
involve himself in the encounter because “this is between the two women.”  Holmes
testified he did not know about the 2007 Altercation and responded to appellant
that he did not understand the comment.

Holmes stated that
appellant moved towards him and Holmes warned him to back away, calling
appellant “Old School.”  Appellant and Deborah explained this is a derogatory
term.  Scypion and another witness testified that appellant then placed a gun
in his hand with which he punched Holmes’ head.  Holmes asserted that the blow
felt “mighty hard . . . harder than a fist.”  Scypion stated that Holmes fell
face first on the ground as a result of the punch.  Scypion explained appellant
then shot Holmes in the head.  Holmes acknowledged that bullet fragments remain
in his body.

Scypion testified
Harris next tried to punch her.  After that, he aimed the gun at her head, but
Scypion moved and the bullet hit her left hand.  Aaron Auzenne (“Auzenne”), another
person present outside the nightclub, tried to remove Scypion from the scene
after she was shot.  According to both Scypion and Auzenne, appellant
threatened Auzenne with the words, “Youngster, you don’t want none of this.”  Appellant
and Deborah then got into their maroon sport utility vehicle (“SUV”) and drove
away from the scene.

The Port Arthur Police
Department arrived at the scene of the shootings.  Detective Lakeisha Thomas was
present at the French Connection when she heard Deborah Harris’ name in
connection with the incident.  She testified she recognized the name and asked dispatch
to relay Deborah’s address.  Detective Thomas stated she then went to Deborah’s
home, where nobody responded when police knocked on the door.  Officer Matthew
Bulls testified that when the police called Deborah Harris’ home, nobody
answered the telephone.

The police found the
SUV in a neighbor’s driveway.  The SUV was obscured by bushes and Officer Bulls
testified it would have been difficult to see from the street.  Officer Bulls
stated that the neighbor, Robin Bazille, told him he did not to know why the
SUV was parked in his driveway.  Bazille gave permission for the police
department to impound the SUV.  

Appellant’s Account

Deborah testified she
noticed Scypion when Scypion entered the club.  Deborah indicated to appellant
who Scypion was, noting she was one of the women involved in the 2007
Altercation.  Deborah explained that later that night she was in the women’s
restroom talking with a third party when Scypion entered the restroom.  Deborah
testified Scypion did not speak, but “just looked at me,” even after Deborah
told her, “Not tonight.  Not today — not tonight.”  Deborah explained that she meant she
did not want to have another altercation with Scypion.  Deborah said she left
the restroom after making that statement.

Deborah testified she
and appellant stayed in the nightclub for about another twenty minutes after
she exited the restroom.  When they walked outside, Deborah saw Scypion and
Holmes in front of the nightclub.  Deborah believed Scypion was waiting for
them and wanted to “hurt” her.  Deborah stated that she stopped walking while
she figured out how to get to her car across the street.  It was at this point appellant
warned Holmes not to get involved because “what was going on was between me and
[Scypion].”  

Both Deborah and
appellant asserted that Holmes then moved towards appellant and referred to him
as “Old School.”  Appellant admitted he punched Holmes because he “stepped
within what I call my comfort zone” without cause.  After appellant hit Holmes,
the Harrises testified they immediately left the scene in their SUV.  Both of
them stated appellant did not have a firearm in his possession and did not
shoot anyone.  They also testified they had no knowledge of how Holmes and
Scypion were shot.

After leaving the
scene, the Harrises went to Deborah’s home.[1]  Deborah testified that she routinely parked in the
neighbor’s driveway where the SUV was found.  She also explained they did not
respond when the police officers knocked on her door and telephoned her because
she was afraid.  Deborah stated she was afraid because she knew appellant had
hit Holmes, which meant “there was going to be a deal if the police . . . got
involved.”

Appellant testified
that Bazille called after the police left his home to inform him that the
police officers wanted to speak with him.  Officer Bulls acknowledged that appellant
appeared at the police station sometime after daybreak the next morning and
made a statement to Detective Brian Fanette.  Detective Fanette did not arrest
appellant at that time.

Trial Proceedings

During voir dire,
defense counsel asked if any member of the venirepanel knew anyone in the
district attorney’s office.  Venireperson No. 6 answered that he was a friend
and hunting partner of a supervising attorney, Ed Shettle, at the district
attorney’s office.  The following exchange then occurred:

Defense Counsel:  Now, occasionally, Mr. Shettle does come
to the courtroom, all right, and he’s the supervising attorney and he may make
suggestions.  You will never hear it, however; but you may see his face.  If he
came in and had something to do with this case, would that sway you one way or
another?

Venireperson:  It possibly could.

Defense Counsel:  The question is, of course, at the end of
everything that goes on in the courtroom, can you be fair and impartial knowing
what you know, that Mr. Shettle is a hunting buddy of yours? 

…

Venireperson:  Yes.

Defense Counsel:  So, when you say it possibly could have
an [effect] on you, you mean that it wouldn’t have an [effect] on you?

Venireperson:  It possibly could.

Defense Counsel:  We have to be certain.  Will it or won’t
it?

Venireperson:  I would say yes.

At the end of voir dire, appellant made a challenge
to Venireperson No. 6 for cause.  The trial court denied the motion, noting
that he did not believe the venireperson to be expressing a belief that he
could not be fair or impartial in the trial.  The district attorney added that
he could inform Mr. Shettle that he should refrain from entering the courtroom. 
The trial court then added, “[W]hat I heard was that if Mr. Shettle spoke and
made some representations, that the jury could be influenced but that is moot
if Mr. Shettle makes no statements and that would be the first time in three
and a half years that he would have made a statement during the course of a
trial here.”  

The trial court overruled the challenge.  

Appellant then requested an extra preemptory strike,
which was denied.  

Venireperson No. 6 was not seated on the jury. 
Appellant stated on the record that he would have used a preemptory strike on
Venireperson No. 26 but could not because he was denied his challenge for cause
on Venireperson No. 6.

The jury found appellant guilty of aggravated assault
of Holmes, but not guilty of aggravated assault of Scypion.  The prosecution
and appellant agreed to a sentence of fifteen years’ imprisonment, which was
imposed by the trial court.

DISCUSSION

Appellant asserts three points of error.  We discuss
each in turn.

I.                  
Did the Trial Court Err By Denying Appellant’s Challenge for
Cause of a Veniremember?

 Appellant contends that the trial court erred
because it did not remove Venireperson No. 6 for cause.

A.     Standard
of Review

To preserve error when a trial court denies a
challenge for cause, the record must show appellant:  (1) asserted a clear and
specific challenge for cause; (2) used a preemptory challenge on the
complained-of venireperson; (3) exhausted all preemptory challenges; (4) requested
additional strikes, which the trial court denied; and (5) had an objectionable
juror sit on his jury.  Sells v. State, 121 S.W.3d 748, 758 (Tex. Crim.
App. 2003).  It is the appellant’s burden to show the venireperson understood
the requirements of the law and could not overcome his prejudice enough to
follow it.  Id. at 759.

The trial court is the proper authority to determine
a venireperson’s ability to serve.  Code Crim. Proc. Ann. art. 35.21 (West
2010). We review a trial court’s decision to deny a challenge for cause under
an abuse of discretion standard.  Russeau v. State, 171 S.W.3d 871, 879
(Tex. Crim. App. 2005); Colburn v. State, 966 S.W.2d 511, 517 (Tex.
Crim. App. 1998).  An appellate court has a duty to examine the record as a
whole to determine whether there is support for the trial court’s ruling.  Ladd
v. State, 3 S.W.3d 547, 559 (Tex. Crim. App. 1999).  If there is support,
we must defer to the trial court because the trial court actually witnessed the
venireperson’s demeanor.  Id.  “If a venireperson vacillated or
equivocated with respect to his ability to follow the law, the appellate court
must defer to the trial court’s judgment.”  Id.  

B.      Discussion

We conclude appellant met his burden to preserve
error.  We therefore consider whether appellant met his burden to show the
venireperson could not overcome a bias against him.  Sells, 121 S.W.3d
at 758.  Appellant’s questions centered on Venireperson No. 6’s possible
reaction if Mr. Shettle were to enter the courtroom and possibly give
arguments.  Specifically, he was asked, “If [Shettle] came in and had something
to do with this case, would that sway you . . .?”  The Venireperson answered
that it “possibly could.”   Nonetheless, when the Venireperson was asked if he
could be fair and impartial, he responded, “yes.”  Based upon the record, we
conclude the Venireperson made vacillating statements that: (1) he could be
fair and impartial; and, (2) the presence of Shettle in the courtroom might
have an effect on him.  

Under an abuse of discretion standard, we defer to
the trial court’s judgment if there is any support for the ruling in the
record.  Ladd, 3 S.W.3d at 559.  The trial court stated on the record
that “what I heard was that if Mr. Shettle spoke and made some representations,
that the juror could be influenced but that is moot if Mr. Shettle makes no
statements . . .”[2] 
Moreover, the district attorney stated on the record that Mr. Shettle could be
ordered to stay out of the courtroom during the trial.  The record includes
support for the trial court’s interpretation of the Venireperson’s statements,
so we defer to the trial court.  Id.  

We overrule appellant’s first point of error.

II.              
Did the Trial Court Err By Admitting The Complainants’ Medical
Records (State’s Exhibit 1) into Evidence?

Appellant contends the trial court erred by admitting
the medical records of Scypion and Holmes over his objection.  These records
detailed both complainants’ medical treatment after they received gunshot
wounds.

A.     Standard
of Review

We review a trial court’s decision to admit or
exclude evidence under an abuse of discretion standard.  Oprean v. State,
201 S.W.3d 724, 726 (Tex. Crim. App. 2006).  An appellate court must uphold the
trial court’s decision unless it falls outside the “zone of reasonable
disagreement.”  Id. (citing Montgomery v. State, 810 S.W.2d 372,
391 (Tex. Crim. App. 1991).  

B.     Analysis

Appellant objected at trial to the admission of the
medical records on the grounds that records were not produced in accordance with
the trial court’s discovery order.  The order required the prosecutor to make “all
physical evidence that could be offered at trial” available to the defense if
it was in “the possession, custody or control of the state or any of its
agencies, or otherwise reasonably available to the prosecution.”  The
prosecution, upon defense written request, was to make those materials
available within thirty days.  Defense counsel requested the medical records
months before trial, but received them on the day before the complainants were
to testify about their injuries.  The prosecution contended that the hospital
waited to provide the records to it, so it could not produce them earlier.

The trial court overruled appellant’s objection and
the medical records were admitted into evidence.

Appellant contends on appeal that he did not have
adequate notice to prepare a defense because the medical records were given to
the defense so late.  Nonetheless, Scypion testified that she was shot through
the left hand.  She stated that the bullet went through her hand, hit a bone,
and “came back out.”  She explained that she continues to have numbness and has
lost motor control and strength in that hand as a result of the shooting. 
Holmes testified that he remembered being shot, feeling blood, and a bullet
remains in his head.  He stated that he was only in the hospital overnight, but
continues to be monitored by a neurologist.  All of this testimony occurred
without objection from appellant.  

Even assuming arguendo that the trial court
erred by admitting the medical records, we conclude the error was harmless. 
Improper admission of evidence is not reversible error if the same or similar
evidence is admitted without objection.  Mayes v. State, 816 S.W.2d 79,
88 (Tex. Crim. App. 1991); Nino v. State, 223 S.W.3d 749, 754 (Tex.
App.—Houston [14th Dist.] 2007, no pet.).  Scypion and Holmes’ testimony was
the same or similar as the medical records.  As a result, we overrule
appellant’s second point of error.

 

III.           
 Did the Trial Court Allow Improper Cross Examination of
Appellant’s Wife?

Appellant contends the trial court erred by allowed
the prosecution to ask Deborah, “Do you believe that the young man and young
woman had someone else shoot them just to get your husband in trouble?”  

A.     Standard
of Review

We utilize the same standard of review as in Part II
above.

B.      Analysis

Deborah explained on direct examination that
appellant hit Holmes, but did not shoot anyone.  On cross examination, the prosecutor
asked, “Do you believe that the young man and the young woman had someone else
shoot them just to get your husband in trouble?”  

Appellant objected, stating, “That’s not proper
cross-examination . . . for her to speculate on what the other people would do
to the extent to get Mr. Harris in trouble.”

The trial court overruled the objection.

Deborah responded, “No, I don’t think they would do
that.  I don’t see why they would do that.”

Appellant argues on appeal that the question: (1)
required Deborah to respond based upon speculation; (2) is irrelevant; and, (3)
required Deborah to have personal knowledge that she lacked.  See Tex.
R. Evid. 401; 402; 602.  Appellant waived the second and third objections
because he did not present them to the trial court.  Tex. R. App. P. 33.1(a).  

Lay witnesses may give opinion testimony only if they
are: (1) rationally based on the perception of the witness; and, (b) “helpful
to a clear understanding of the witness’ testimony or the determination of a
fact issue.”  Tex. R. Evid. 701.  A lay witness cannot testify to what another
person is thinking.  Fairow v. State, 943 S.W.2d 895, 899 (Tex. Crim.
App. 1997).  The lay witness may testify to an opinion if it is based upon the
witness’ objective perception of events.  Id.  It is the fact finder’s
province to determine what weight to give that opinion.  Id.

In this case, Deborah had already testified that she
knew Scypion as a student and had multiple interactions with her, including the
2007 Altercation.  She testified that she  interpreted Scypion’s actions at the
French Connection as threatening.  Furthermore, she testified that she had an
opinion that Scypion and Holmes were waiting for her outside the nightclub to “hurt”
her.  Throughout her testimony, Deborah speculated about the reasons for
Scypion and Holmes’ actions based upon her perception of events.  Id.  

Furthermore, the prosecution did not ask Deborah
whether Scypion or Holmes had themselves shot.  It asked whether she believed
that theory of events, asking her to draw upon her own perceptions of Scypion’s
character, the nature of the dispute between herself and Scypion, and her
objective understanding of the level of conflict between Holmes and appellant. 
Tex. R. Evid. 701.  

We review the trial court’s decision to permit
Deborah to answer that question under an abuse of discretion standard.  Oprean,
201 S.W.3d at 726.  We conclude the trial court could have found that the question
was grounded in Deborah’s objective perceptions and not on speculation about
the state of mind of Scypion or Holmes.   The trial court could have further
determined this opinion was helpful to the jury because it helped eliminate a
possible alternative theory of the crime.  Id.

As a result, we overrule appellant’s third point of
error.

IV.            
 Did the Cumulative Effect of the Alleged Errors Lead to an
Unfair Trial?

Appellant contends in his final point of error that
all of the alleged errors combined deprived him of a fair trial.  We have
considered each point of error brought forward by the appellant and have
concluded there was no error.  Consequently, there is no cumulative error to
consider.  Chamberlain v. State, 998 S.W.2d 230, 238 (Tex. Crim. App.
1999).  As a result, we overrule appellant’s final issue.

CONCLUSION

Having overruled each of appellant’s points of error,
we affirm the trial court’s judgment.

 

 

                                                                        

                                                                        /s/        John
S. Anderson

                                                                                    Justice

 

 

 

Panel consists of Justices
Anderson, Brown, and Christopher. (Christopher, J., Concurring).

Do
Not Publish — Tex. R. App. P. 47.2(b).









[1] Appellant testified that
he and Deborah maintained separate residences even though they were legally
married.





[2] The record does not
indicate Shettle made any arguments in appellant’s case and is silent about
whether Shettle appeared in the courtroom.